DOROTHY VESEY, Indiv. and as Next Friend of Lonzo Vesey, Plaintiff-Appellant, v. CHICAGO HOUSING AUTHORITY, Defendant-Appellee.

First District (4th Division)   No. 1—89—1503

Opinion filed November 1, 1990.

Karlin & Fleisher and David A. Novoselsky & Associates, both of Chicago (David A. Novoselsky and Tammy A. Koester, of counsel), for appellant.

Moore & Maisel, of Chicago (Gary K. Moore and Thomas J. Branit, of counsel), for appellee.

JUSTICE LINN delivered the opinion of the court:

Plaintiff, Dorothy Vesey, individually and on behalf of her infant, Lonzo Vesey, brought this action against the Chicago Housing Authority (CHA) to recover damages for Lonzo's severe injuries that resulted from his contact with exposed radiator pipes.

The CHA moved for summary judgment on the ground that, as a landlord, it owed no duty to insulate or cover exposed steam pipes in the tenant's premises and that the evidence was insufficient to establish that it was on notice of any allegedly defective condition.

The trial court initially denied the parties' cross-motions for summary judgment, but after a second hearing on the issues, granted the CHA's motion for summary judgment. The court held that there was insufficient evidence to sustain plaintiff's burden of showing that the CHA had performed a voluntary act in a negligent manner, or that the CHA was on notice of the allegedly defective condition.

On appeal, plaintiff contends that the trial court's judgment should be reversed and remanded for trial on the issues of whether the CHA negligently undertook to guard the radiator and whether it was on notice of the allegedly defective condition of the radiator pipes.

We reverse and remand.

BACKGROUND

On March 25, 1984, six-month-old Lonzo Vesey was severely burned when he came into contact with an exposed pipe or heating coil from a radiator in the apartment of his baby-sitter. The pipes and radiator formed part of a steam heating system in the Henry Horner Homes public housing project owned by the CHA. At the time, the infant was in the care of Lola McClinton who, along with her sister, Josephine McClennon, lived in apartment 1403. According to Lola, Lonzo had been attracted to the clicking noises the radiator made as the steam moved up through it. On the night of the incident, Josephine had put the baby to bed between 10:30 and 11 p.m., placing him on the bed on his stomach with a pillow propped on either side of him. She testified in her deposition that she went to sleep next to him at 12:30 p.m. and woke up when she heard him screaming. His hand was still stuck to the pipe when she picked him up. She also saw that his thigh was severely burned. Lonzo was taken to the hospital, where his finger was amputated because of his serious burns.

Plaintiff's second amended complaint alleged that the CHA had negligently maintained apartment 1403 in that it had allowed a dangerous condition to remain on the premises after notice of the defect. This defect consisted of an uncovered pipe in conjunction with the clicking noise that attracted Lonzo, causing the infant's injuries. The complaint alleged that the CHA was negligent for failing to provide a cover or guard; failing to repair the exposed heating coil; failing to warn of the condition; and for failing to set up and operate an inspection program to discover hazardous conditions.

The CHA filed several motions directed at the second amended complaint, including motions to strike and dismiss pursuant to section 2—615 of the Code of Civil Procedure and a motion to dismiss pursuant to section 2—619. (Ill. Rev. Stat. 1989, ch. 110, pars. 2—615, 2—619.) Those motions were denied, and the CHA filed two answers to the second amended complaint (the second one apparently without leave of court). In its answers, the CHA denied the allegations and pleaded certain affirmative defenses, which are not directly in issue since the pending summary judgment order was based on plaintiff's failure to state sufficient facts on all elements of negligence to withstand the entry of summary judgment.

In November 1986, the trial court first considered the issues raised on summary judgment. By that time, the parties had taken discovery and the court had before it the affidavits of Lola McClinton

and Josephine McClennon; their depositions; and the deposition of CHA engineer Myles Duran. The essence of the CHA's position was that, under Illinois law, the CHA had no duty to provide radiator guards under the decision of *Hubbard v. Chicago Housing Authority* (1985), 138 Ill. App. 3d 1013, 487 N.E.2d 20, *appeal denied* (1986), 111 Ill. 2d 581. According to the CHA, *Hubbard* holds that no cause of action can be premised on a landlord's failure to provide radiator guards to prevent contact with exposed heating pipes that are not otherwise alleged to be defective. The trial court nevertheless denied summary judgment, ruling that the evidence in support of summary judgment must be "clear beyond a doubt" and that several questions remained that were appropriate for consideration by the finder of fact. The court concluded that there were "too many open questions. And due to that kind of speculation, [the court] must deny the motion."

In May 1989, on the eve of trial, the CHA brought another motion for summary judgment, before the same judge. It appears that, with the exception of the deposition of plaintiff's expert witness, no further depositions had been taken and the facts adduced of record had not changed since the 1986 summary judgment hearing. The CHA relied primarily on its previous contentions, along with the additional case of *Trotter v. Chicago Housing Authority* (1987), 163 Ill. App. 3d 398, 516 N.E.2d 684, *appeal denied* (1988), 119 Ill. 2d 576, 522 N.E.2d 1258. *Trotter* is an opinion from the same division of the appellate court that decided *Hubbard*. The trial judge stated that he viewed the matter differently from the way he had the first time and granted the CHA's motion for summary judgment. The judge stated that he was bound to follow the majority opinion in *Trotter*. The judge stated that there was insufficient evidence of a negligent undertaking and further concluded that the record lacked competent evidence of notice to the CHA, acknowledging that the result would be different "if there was any kind of evidence at all of some kind of notice to the CHA to repair this."

OPINION

■■ The general principles governing summary judgment are simply stated and need not be recited at length. If the material facts are undisputed and the sole question presented is the application of law to those facts, summary judgment is the proper way to dispose of a case, if reasonable minds could not draw contrary inferences. (See *Amalgamated Trust & Savings Bank v. Silha* (1984), 121 Ill. App. 3d 1033, 460 N.E.2d 372.) Similarly, if controlling law establishes that the com-

plaint fails to state a cause of action under Illinois law, summary judgment likewise would be proper. (*Dodd v. Cavett Rexall Drugs, Inc.* (1988), 178 Ill. App. 3d 424, 533 N.E.2d 486 (trial court will grant summary judgment in negligence action if under pleadings, depositions, affidavits, and admissions it appears that the defendant owned no duty to the plaintiff).) We are not persuaded, however, that the evidentiary record in this case or the pertinent law supports the entry of summary judgment in favor of the CHA.

## THE QUESTION OF DUTY

The CHA contends that it cannot be held liable to the minor plaintiff as a matter of law because (1) it had no duty to protect him from contact with exposed steam pipes, under principles of landlord/tenant law, and (2) it cannot be held liable for failure to repair a condition of which it had no notice. In contrast, plaintiff focuses on the theory that the CHA negligently performed the voluntary undertaking of properly guarding the exposed steam pipes. Plaintiff also contends that the CHA had notice of the allegedly unsafe condition. The CHA does concede that liability may be imposed under the negligent undertaking theory, but maintains that the record is devoid of facts to support such theory.

As the parties' respective positions indicate, the issue of duty in the pending case has two parts: (1) does the law as applied to these facts support the imposition of any duty to repair or maintain, based on land owner or landlord/tenant principles, and (2) even assuming the CHA had no general duty to safeguard the steam pipes in the apartment, do the facts support the theory that the CHA negligently performed a voluntarily assumed duty to safeguard the pipes?

## THE DUTY TO REPAIR AND MAINTAIN PREMISES IN A SAFE CONDITION

The CHA primarily relies on the holdings of *Hubbard v. Chicago Housing Authority* (1985), 138 Ill. App. 3d 1013, 487 N.E.2d 20, and *Trotter v. Chicago Housing Authority* (1987), 163 Ill. App. 3d 398, 516 N.E.2d 684. The *Hubbard* case did not involve a negligent undertaking theory, but rather held that in the absence of a defect in the heating system installed in a public housing complex, the mere fact that a steam pipe was hot and exposed would not give rise to liability for a tenant's injuries from the uninsulated steam heating pipe. *Hubbard* accordingly affirmed the trial court's dismissal of the adult tenant's lawsuit in that case, finding that the complaint failed to state a cause of action.

In so holding, *Hubbard* cited "well-settled" law that "a landlord is

not liable for injuries sustained by a tenant on premises leased to the tenant. \*\*\* 'In multiple-unit dwellings, a landlord owes his tenants a duty of reasonable care in the management and maintenance of areas open for use by all tenants, and not part of the premises occupied by one tenant.' " *Hubbard*, 138 Ill. App. 3d at 1015, 487 N.E.2d at 22, quoting *Webster v. Heim* (1980), 80 Ill. App. 3d 315, 316, 399 N.E.2d 690, 691.

The same panel of the same division of the court that decided *Hubbard* had occasion to further analyze its decision in *Trotter v. Chicago Housing Authority* (1987), 163 Ill. App. 3d 398, 516 N.E.2d 624. *Trotter* also involved an unguarded steam pipe injury, and the majority opinion held that summary judgment was properly entered in favor of the CHA. The plaintiff in *Trotter* was 11 months old, and he was burned when he fell from a bed onto exposed steam pipes in a Henry Horner apartment unit. The trial court granted summary judgment, relying on *Hubbard*. On appeal, the *Trotter* majority again cited the general, common law principle that a landlord has no duty—to his tenant—to maintain and repair the leased premises. The court rejected the plaintiff's position that the feudal concepts of landlord and tenant should be modified in conformance with modern realities and changing case law. In addition, the court rejected plaintiff's position that the CHA as a landowner owed a duty to prevent foreseeable injuries to children when such injuries result from a dangerous condition on the premises. *Kahn v. James Burton Co.* (1955), 5 Ill. 2d 614, 126 N.E.2d 836 (substituting in place of the "attractive nuisance" doctrine the general rules of negligence, including the foreseeability of danger to children and a determination of whether the expense or inconvenience of remedying the condition is slight compared with the risk of harm).

The dissenting opinion in *Trotter* set out additional facts, including evidence that the CHA maintenance office had made repairs in the apartment on other occasions and that after the incident, the CHA apparently covered the bare pipes with insulating material. "Apparently, other children had been burned on hot steam pipes in the CHA project." 163 Ill. App. 3d at 404, 516 N.E.2d at 688 (Buckley, J., dissenting).

Justice Buckley analyzed decisions of the Illinois Supreme Court and courts of other jurisdictions, some of which have imposed on landlords a general duty of due care to provide safe conditions in demised premises without regard to possession or control. See, *e.g., Sargent v. Ross* (1973), 113 N.H. 388, 396-97, 308 A.2d 528, 533 (rationale based on implied warranty of habitability contained in leases); see also

*Javins v. First National Realty Corp.* (D.C. Cir. 1970), 428 F.2d 1071, 1074, *cert. denied in First National Realty Corp. v. Javins* (1970), 400 U.S. 925, 27 L. Ed. 2d 185, 91 S. Ct. 186 (while feudal assumptions regarding transfers of interest in land may remain reasonable in considering leases of farming or commercial land, today's apartment dweller seeks a package of goods and services including heat, light, ventilation, proper sanitation and maintenance).

A portion of the dissenting opinion in *Trotter* that we find particularly persuasive, for purposes of the instant appeal, is that which deals with the liability of a land owner who leases property with actual or constructive notice of a defective condition which remains uncorrected. (*Trotter*, 163 Ill. App. 3d at 408, 516 N.E.2d at 690, citing *Wagner v. Kepler* (1951), 411 Ill. 368, 371-72, 104 N.E.2d 231, 233.) As in the pending case, the plaintiff in *Wagner* was the child of a tenant of another apartment in the premises. The supreme court held that the owner of property is liable for those defects of which he has actual or constructive notice at the time the premises were leased, to the same extent as if he were in actual possession of the property.

The record in the pending case indicates that the uninsulated condition of the pipes, as well as the apparently misplaced radiator guard, existed at the time that Lola McClinton rented the apartment.

In addition to or in modification of traditional concepts of common law negligence, the legislature has enacted a statutory duty that applies to public entities such as the CHA: section 3—102(a) of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (Ill. Rev. Stat. 1985, ch. 85, par. 1—101 *et seq.*). Section 3—102 imposes a duty on public entities who own or lease property, to maintain such property in a reasonably safe condition for intended or permitted users of the property.[1] This section provides in part:

"(a) Except as otherwise provided in this Article, *a local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition* for the use in the exercise of ordinary care of people whom the entity intended and permitted to use the property in a manner in which and at such times as it was reasonably foreseeable that it would be used, and *shall not be liable for injury unless it is proven that it has actual or constructive notice* of the existence of such a

---

[1]The Tort Immunity Act defines "property of a local public entity" as "real or personal property owned or leased by a local public entity." Ill. Rev. Stat. 1985, ch. 85, par. 3—101.

condition that is not reasonably safe in sufficient time prior to an injury to have taken measures to remedy or protect against such condition." (Emphasis added.) Ill. Rev. Stat. 1985, ch. 85, par. 3—102(a).

This general statement of duty is subject to the notice requirement, which is defined in subsections 3—102 (b)(1) and (b)(2):

"(b) A public entity does not have constructive notice of a condition of its property that is not reasonably safe within the meaning of Section 3—102(a) *if it establishes either*:

(1) The existence of the condition and its character of not being reasonably safe *would not have been discovered by an inspection system that was reasonably adequate considering the practicability and cost of inspection weighed against the likelihood and magnitude of the potential danger* to which failure to inspect would give rise to inform the public entity whether the property was safe for the use or uses for which the public entity used or intended others to use the public property and for uses that the public entity actually knew others were making of the public property or adjacent property; or

(2) The public entity maintained and operated such an inspection system with due care and did not discover the condition." (Emphasis added.) Ill. Rev. Stat. 1985, ch. 85, pars. 3—102(b)(1), (b)(2).

■ The immunity that section 3—102 bestows on a public entity is therefore limited to those "unsafe conditions" on its premises of which the entity cannot be said to be aware, or for injuries which may be found "unforeseeable." Sections 3—102(b)(1) and (b)(2), by their terms, place the burden of proof on the public entity to establish either that a "reasonably adequate" inspection system would *not* have discovered such unsafe condition, or, that the public entity had such an inspection system but still did not discover the condition, despite the use of due care. While the initial burden of demonstrating notice is on the party charging it (*Buford v. Chicago Housing Authority* (1985), 131 Ill. App. 3d 235, 246, 476 N.E.2d 427, 435), if the public entity bases its immunity on the grounds set out in section 3—102(b), it has the burden of satisfying the statutory standard therein set out. *Buford,* 131 Ill. App. 3d at 248, 476 N.E.2d at 437.

In *Buford,* a child was injured in an elevator accident and the jury determined that the CHA was on notice of the defective condition of the elevator. The trial court granted judgment *n.o.v.* on the constructive notice issue. The appellate court reversed, however, citing evidence from which the inference could be made that the CHA knew or

should have known of the unsafe condition of the elevator and rejecting the CHA's argument under section 3—102(b) that it had maintained a "reasonably adequate" inspection system. The court held that, under "the balancing test posited in section 3—102(b)(1)," the CHA failed to establish either that its own "inspection" program, or the program conducted by the elevator maintenance service, "was adequate to discover the defect. *** While plaintiff did not show the expense entailed [in using a force gauge that may have discovered the defect], the burden of establishing the reasonableness of an inspection system under section 3—102(b) rests with the public entity." 131 Ill. App. 3d at 248, 476 N.E.2d at 437.

■■ We conclude that the legislature, in enacting section 3—102, intended that a public entity would be held to the duty of ordinary care in maintaining all of its property in a *reasonably safe condition*, subject to the qualifications of that duty as set out in that section. To the extent this legislative expression of duty in the public housing context conflicts with other, general principles of landlord/tenant relationships, the statute controls. Of course, the statutory and common law duty analysis may be the same in certain contexts, and we do not suggest that traditional tort principles have been displaced by the statute. (See, *e.g., Lance v. Senior* (1967), 36 Ill. 2d 516, 518 (consideration of whether duty should be imposed depends on the "likelihood of injury, the magnitude of the burden of guarding against it and the consequences of placing that burden upon the defendant"); *Bonamie v. Welsh* (1981), 95 Ill. App. 3d 349, 420 N.E.2d 243) (landowner is not an absolute insurer and "plain ordinary" conditions that are not alleged to be defective or inherently dangerous do not form the basis for liability).

Section 3—102 does not condition the public entity's liability on its exclusive control over or possession of the premises in question, however. This may be viewed as a departure from the general principle that a landlord is not liable to the tenant for maintenance and repair because the leasehold contemplates that the tenant bears this responsibility. Moreover, the constructive notice requirement of the statute reflects a balancing of concerns, as *Buford* noted. Consonant with the common law, section 3—102 provides that the landowner cannot be held liable for unsafe conditions of which it lacks "notice." In modification of the common law, however, section 3—102(b) specifically defines constructive notice in terms of a reasonable inspection program designed to *prevent* unsafe conditions.

■■ The record before us contains enough evidence that the CHA knew or should have known of the condition of the steam pipes and

guard to let the case proceed to trial.[2] The deposition of the CHA's engineer admits that the CHA provided maintenance services including some type of adjustment or check of the radiators in each apartment. The engineer acknowledged that, from photographs he was shown, the device installed to guard the pipes in issue was tipped out of position. The CHA maintains and operates the steam heating system. We conclude that reasonable minds could infer that the CHA's staff was able to view the allegedly unsafe condition during whatever routine checks were made. Accordingly, we find that plaintiff's preliminary showing on the notice issue is adequate to withstand summary judgment.

We further note that the CHA has pleaded an affirmative defense based on the immunity provision of section 3–102. The affirmative defense is not before us and we express no opinion on its merits, although the burden of proof would be on the CHA as to the adequacy of any inspection program for purposes of constructive notice.

FORESEEABILITY OF HARM

■ The question of duty includes a consideration of the CHA's ability to foresee the danger of harm caused by the allegedly unsafe condition, and the attendant policy question of whether the expense of remedying the condition is slight compared with the risk of harm. On these matters, we depart from the reasoning in the *Trotter* majority's opinion. The court stated that "the CHA could not reasonably foresee that an 11-month-old infant, who was beginning to be active, would be left unattended on a bed without sides." (*Trotter*, 163 Ill. App. 3d at 402, 516 N.E.2d at 687.) Even if we adopt the questionable assumption that people who live in public housing projects can easily afford to buy "beds with sides" for all of their infant children, we find it quite foreseeable that in a public housing tenement, many children of all ages may come in contact with exposed, hot steam pipes that run horizontally across walls in their apartments. A parent or caretaker's duty to supervise and protect that child is a separate issue from the

---

[2]We find little in the record to support actual notice to the CHA. The deposition testimony of Lola and Josephine on that issue contradicts statements in their affidavits. While their credibility ultimately will be judged by the fact finder, conflict in the testimony regarding actual notice is at best impeachment on a collateral issue. Lonzo's right to recover does not depend on the competence of those statements. See *Fuller v. Justice* (1983), 117 Ill. App. 3d 933, 453 N.E.2d 1133 (facts unrelated to essential elements of plaintiff's cause of action are immaterial and their presence in the record has no bearing on whether a party is entitled to judgment as a question of law).

landowner's ability to *foresee* the danger. Certainly, small children routinely escape their caretakers' notice for brief periods, and such "unattended" children may foreseeably be harmed on unsafe conditions within their homes.

We do not imply that foreseeability alone is determinative of duty. Nor are we suggesting that the CHA or any landlord must assume the burden of "child-proofing" its premises. A landowner is not responsible to protect against open and obvious conditions that even young children are presumed to have enough knowledge of to avoid, such as the hazards of falling, being burned in fires, or risks of drowning. (See *Corcoran v. Village of Libertyville* (1978), 73 Ill. 2d 316, 383 N.E.2d 177.) Accordingly, we do not hold that radiators, or the pipes leading to them, are *per se* dangerous conditions that impose a duty to protect against, particularly when considering the experience and ability of an adult or older child to protect himself. Therefore, our reasoning is consistent with that of *Hubbard*, to the extent the adult plaintiff in that case sought to recover on a theory that his landlord owed him a duty to provide guards for the hot pipes of the radiator in his apartment.

With regard to the relative burden of safeguarding steam pipes and heating coils, we note that the CHA's engineer, Doran, testified that his department did keep "spare" guards on hand. We are in no position to take judicial notice that the large number of units in the public housing system would make the cost of safeguarding heating coils and pipes prohibitive. (*Cf. Trotter*, 163 Ill. App. 3d at 403, 516 N.E.2d at 687 (taking judicial notice of the large number of public housing units).) In fact, section 3—201(b)(1) by its terms makes such considerations relevant to the balancing test that is applied thereunder to determine whether an inspection system could be feasibly designed to prevent the particular risk of harm.

We conclude that neither *Hubbard* nor *Trotter* should be used to obviate the general duty of care that the CHA owes, as a public entity, to foreseeable users of its property pursuant to section 3—102.[3] See also *Nelson v. Commonwealth Edison Co.* (1984), 124 Ill. App. 3d 655, 465 N.E.2d 513, for incisive analysis of the role of "foreseeabil-

---

[3]In a decision filed September 14, 1990, the fifth division of this court has followed *Hubbard* and the *Trotter* majority to conclude that the CHA has no duty in negligence to protect against exposed steam pipes. (*Loving v. Chicago Housing Authority* (1990), 203 Ill. App. 3d 205 (holding that seven-month-old who was severely burned on radiator pipes while in a babysitter's apartment had no cause of action against the CHA).) None of these cases has construed the scope of the statutory duty of section 3—102, however.

ity" and the recognition that "the legal concept of 'duty' is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." 124 Ill. App. 3d at 662, 465 N.E.2d at 519.

DUTY TO PERFORM VOLUNTARY UNDERTAKING IN A NONNEGLIGENT MANNER

■ Finally, we address plaintiff's "negligent undertaking" theory. For analytical clarity, we view this theory as an alternative way in which to impose a duty upon a landlord or landowner who otherwise would not owe any duty to the particular injured party. In essence, a person who is a volunteer, or who has no legal duty to another in the first instance, may be held liable if he or she undertakes to perform some act for a person and performs it in a negligent manner, causing injury. Hence, the Illinois Supreme Court has found actionable an insurance company's negligent performance of a voluntarily undertaken duty to make safety inspections when injury resulted from the careless or negligent performance of such inspections. (*Nelson v. Union Wire Rope Corp.* (1964), 31 Ill. 2d 69, 199 N.E.2d 769.) The supreme court rejected the defendant's argument that since it had no duty to perform the inspections and since the plaintiff had not relied upon such inspections, no duty had come into existence and there was no causal connection between the inspection and the injury. The court distinguished the negligent performance of a voluntary undertaking from the mere failure to perform a voluntary duty, which is not actionable unless the plaintiff has relied on such performance. *Nelson*, 31 Ill. 2d at 85-86, 199 N.E.2d at 779 ("[D]efendant's liability for the negligent performance of its undertaking, as distinguished from a failure to perform, is not limited to such persons as might have relied upon it to act but extends instead to such persons as defendant could reasonably have foreseen would be endangered as a result of negligent performance"). See also *Phillips v. Chicago Housing Authority* (1982), 89 Ill. 2d 122, 127-28, 431 N.E.2d 1038, 1041 (liability for negligent performance of voluntary undertaking is not limited to situations where the undertaking itself increases the risk of danger or creates a new risk of harm, but extends as well to the failure to complete or carry out an assumed duty).

Plaintiff contends that by providing the steam pipe guard in the first instance the CHA undertook to keep them in proper condition. The record indicates that the guard in issue was turned around so that it did not provide the intended protection. The record further

contains the admissions of the CHA engineer that his staff routinely goes into each apartment to flood the radiators; that they keep spare guards for the radiators; that there is a procedure for handling tenants' requests for repairs and maintenance; and that, in the opinion of plaintiff's engineering expert, the exposed portions of the steam pipe, not covered by insulation, plus the inverted position of the metal guard constituted an unreasonably hazardous condition.

■ We agree with the CHA that the negligent undertaking theory does not create a new or expanded duty beyond the scope of the specific undertaking itself. Thus, in *Pippin v. Chicago Housing Authority* (1979), 78 Ill. 2d 204, 399 N.E.2d 596, the court held that the CHA, by undertaking to hire a security service, had only undertaken to use reasonable care in engaging the particular company that was to provide guard services. It had no independent duty to protect the plaintiff from criminal assault, but instead could be held liable at most for the negligent hiring of the security service.

The CHA maintains that its mere provision of a guard in 1955 cannot be "stretched" beyond the scope of the initial undertaking or be interpreted as guaranteeing "that the guard would remain in its original condition over the span of nearly 30 years."[4]

Without deciding the issue, we do question the suitability of the negligent undertaking theory under the facts of this case. While it is clearly applicable to those situations in which the defendant provides a safety device that, due to his own negligence, fails to prevent the anticipated harm, increases the hazard or gives rise to third-party reliance (see *Scott E. Fetzer Co. v. Montgomery Ward & Co.* (1986), 112 Ill. 2d 378, 493 N.E.2d 1022 (fire alarm system)), we find that the pending circumstances are more suitably considered as a breach of the duty to repair an unsafe condition of which the land owner has actual or constructive notice.

---

[4]The case it cites for the proposition that a voluntary undertaking cannot "continue *** indefinitely" is *Chisolm v. Stephens* (1977), 47 Ill. App. 3d 999, 1006, 365 N.E.2d 80, 85. *Chisolm* in turn relies on *Hubbard v. Aetna Insurance Co.* (1976), 37 Ill. App. 3d 666, 347 N.E.2d 396, where the court was discussing the defendant's gratuitous performance of safety inspections and held that it would not impose the *further* duty of *overseeing* the correction of any hazards found as a result of the inspections. (This notion of not expanding the limited nature of the initial undertaking is consistent with *Pippin*'s rationale.) The *Hubbard* court then stated, "A person who assumes to protect others against injury is under no obligation to continue that protection indefinitely." (37 Ill. App. 3d at 671, 347 N.E.2d at 400, citing 57A Am. Jur. 2d *Negligence* §45 (1969).) Section 45 of American Jurisprudence, 2d Edition, does not state that proposition, however, and deals with the immunity of school officers, teachers, and other personnel in the scope of their employment.

■■ Accordingly, we hold that plaintiff has stated an actionable theory of recovery under Illinois law and that the record contains material issues of genuine fact that should not be disposed of summarily. We therefore reverse and remand for further proceedings.

Reversed and remanded.

JOHNSON and JIGANTI, JJ., concur.